## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THE ESTATE OF TYRONE AWKWARD  :
and CELESTINE WASHINGTON,
*Administratrix ad Prosequandum*
*o.b.o. the Estate of Tyrone*  :
*Awkward, and in her own right,*
      Plaintiffs,  :

            v.  :  **OPINION**

WILLINGBORO POLICE DEPARTMENT,:
et al.,
                  :

      Defendants.  :

Civ. Action
No.  07-5083(NLH)(JS)

**APPEARANCES:**

Adam M. Starr, Esquire
Jarve Kaplan Granato, LLC
401 Route 73 North, Suite 204
Marlton, NJ 08053
    *On behalf of plaintiffs*

Matthew B. Wieliczko, Esquire
Dean R. Wittman, Esquire
Zeller & Wieliczko, LLP
Woodcrest Pavilion
Ten Melrose Avenue, Suite 400
Cherry Hill, New Jersey 08003
    *On behalf of Willingboro defendants*

**HILLMAN**, District Judge

    This matter has come before the Court on defendants' motion
for summary judgment on all of plaintiffs' claims arising from
the death of Tyrone Awkward from "positional asphyxia," which
occurred on November 6, 2005, and involved Willingboro, New
Jersey police officers who were attempting to facilitate Mr.
Awkward's involuntary commitment.  For the reasons expressed
below, defendants' summary judgment motion will be granted.

**BACKGROUND**

Decedent Tyrone Awkward carried a longstanding diagnosis of chronic schizophrenia, paranoid type, and over the course of many years, he received treatment at various facilities in the Willingboro, New Jersey area.  Despite his diagnosis, his family described him as a "gentle giant."[1]

In November 2005, Tyrone's family noticed an exacerbation of his symptoms.  After a family party on November 5, 2005, where Tyrone acted erratically, including inappropriately exposing himself to his sister, Tyrone's family members contacted the Screening and Crisis Intervention Program ("SCIP") the next day, asking that Tyrone be evaluated and taken in for treatment.  In response to that call, defendant Officer Matthew Valente escorted Tara Wolozyn Hansen,[2] a SCIP Certified Mental Health Screener who would be evaluating Tyrone's mental competency, to Tyrone's home where he lived with his mother, plaintiff Celestine Washington.

When Officer Valente and Hansen arrived at the residence, but prior to entering Tyrone's home, Hansen informed Officer Valente that they were there to evaluate Tyrone for a potential involuntary commitment.  Also before entering the house, Hansen and Officer Valente approached a taxi that was parked in front of

---

[1]Tyrone was 6 feet, 2 inches tall and weighed approximately 300 pounds.

[2]Pursuant to a stipulation between the parties, plaintiffs' claims against Hansen have been dismissed with prejudice.

2

the house.  In the taxi were Tyrone's cousin, Tracie Rollins, and

her boyfriend, George Dodson.  According to Officer Valente, he

informed Rollins and Dodson that he and Hansen were there to take

Tyrone in for treatment, and he asked whether Tyrone was a

"larger person."  Dodson responded yes, informing him that Tyrone

played football, but that he was a good person and would be

cooperative.  Officer Valente radioed for EMTs and an ambulance,

in case Tyrone would rather be transported in an ambulance than a

police car, and called defendant Officer James Parton to come to

the residence as a precaution.

Hansen, followed by Officer Valente, then entered the house,

where they were met by Tyrone's mother.  The three of them, along

with Tyrone, his sister Naquia Rollins, and his aunt Vanessa

Rollins, congregated in the living room.  Officer Valente and

Hansen explained to Tyrone that they were there to help him.

Tyrone's behavior was normal, but after a few questions by

Hansen, Tyrone's behavior and speech changed, and he began

describing two prior incidents, asking whether she and Officer

Valente were there because of those incidents.[3]  Officer Valente

and Hansen assured Tyrone that they were not there to arrest him,

---

[3]Tyrone spoke about an incident where he allegedly forced
himself onto a female friend, hugging and kissing her.  He also
described his alleged break-in to a local mental disability
housing facility. Tyrone also claimed that he never exposed
himself to anyone; a day or two prior, Naquia had said he exposed
himself to her.

3

and were only there to escort him to the SCIP for help.  Although
Tyrone initially refused to go, with the assurances of Officer
Valente, Hansen, and his mother, he acquiesed and stood up to put
on his shoes.[4]

At this point, Officer James Parton had arrived at the
residence, but remained near the doorway.  Hansen had also
determined during the course of the screening evaluation that
Tyrone should be involuntarily committed, regardless of Tyrone's
indication that he would go to the SCIP voluntarily.  She then
completed an involuntary commitment form, which authorized the
police officers to transport Tyrone to the SCIP.

As Officer Valente escorted Tyrone out of the house, Tyrone
suddenly stopped at the door and asked for his hat.  According to
Tyrone's mother, it was well-known to the family that Tyrone
always wore a hat outside the home.  Tyrone's mother and sister
gave him a baseball cap, but it was not the one he wanted.
Tyrone's mother then went upstairs with Officer Parton to
retrieve the correct hat.

Instead of waiting at the door for Tyrone's mother to bring
her son his hat, Officer Valente continued to escort Tyrone
through the front door.  When they were a few steps out of the
house, Tyrone stopped again upon seeing that a third officer,

---

[4]Tyrone had voluntarily entered the SCIP numerous times
before.

4

defendant Officer Robert Parton, was now on the scene. Upon seeing another police officer, Tyrone slowed his forward momentum, and became agitated. According to Officer Valente, he then placed his hand on Tyrone's lower back and calmly insisted that everything would be fine as long as he came with him to the hospital. Tyrone, however, asked "why are you arresting me," and pleaded to his mother, asking her why she did this to him. He stated that he no longer wanted to go to the hospital, he did not understand why he had to go, he asked for his hat again, explained that he had a job, that he pays his mother rent, and that he had done nothing wrong.

Tyrone then suddenly turned toward the door and attempted to push past Officer Valente in an effort to get back inside the house. As Tyrone tried to push past Officer Valente, Officer Valente "seized the opportunity" to handcuff Tyrone. While attempting to handcuff Tyrone, Officer Valente insisted that they were not arresting him, asked him to calm down, and told him that someone was getting his hat.

Officer Valente managed to apply one handcuff to Tyrone's right wrist, but he could not secure the second cuff due to Tyrone's resistence. Officer James Parton had just stepped outside with Tyrone's hat, and he grabbed Tyrone's left arm to assist Officer Valente in controlling and handcuffing him. Officer Robert Parton then joined the struggle. Initially,

Officer Robert Parton assisted in controlling Tyrone's left arm, but soon restrained his legs. Collectively, in less than a minute, the three officers brought Tyrone to the ground, with Tyrone's face and stomach on the grass. The officers contend that their actions were necessary because the unsecured handcuffs dangling from Tyrone's right wrist became a possible deadly weapon.

The facts up to this point, as relayed above, are mainly uncontested. What happens next is more in dispute. According to Tyrone's mother, when she came downstairs after retrieving her son's hat, she saw that he was face down on the ground with three officers trying to restrain him. She heard Tyrone holler, "George" and "Naquia," and "I can't breathe, I can't breathe." Tyrone's sister and cousin also relate that they saw Tyrone on the ground with three officers piled on top of him, and that he yelled for George and Naquia. They also relate that Tyrone yelled that he could not breathe, which a neighbor and Hansen corroborate. His sister and cousin also state that as the officers and Tyrone continued to struggle, Tyrone was still attempting to pull away in order to breathe. Tyrone's mother reports that during this struggle, two more officers arrived and joined in on the attempt to handcuff and restrain Tyrone. Tyrone's sister and cousin state that they saw eight to ten officers all on top of Tyrone.

6

According to the officers, once Tyrone was on the ground, Officer Robert Parton radioed for more cars at the request of Officer Valente.  The officers state that when Tyrone was on the ground, Officer Valente stretched across Tyrone's back and attempted to pull his handcuffed arm out from under him.  The officers relate that during the entirety of the struggle, they were continuously telling Tyrone to calm down.  Officer James Parton was at Tyrone's side attempting to control his loose left arm, and Officer Robert Parton's arms were wrapped around the lower part of Tyrone's legs.

Defendant Officer Ian Bucs and defendant Sargent James McKendrick then arrived on the scene in response to Officer Robert Parton's call.  Officer Bucs ran toward the struggle, followed quickly by Sargent McKendrick, to assist Officer Valente and Officers James and Robert Parton in controlling Tyrone.  The officers contend that Officer Valente yelled to Officer Bucs and Sargent McKendrick not to hurt Tyrone, that he did nothing wrong, and to "just help us."  The officers relate that Officer Bucs first grabbed Tyrone's shoulders and then moved to his left side to assist Officer James Parton in controlling his left arm. Sargent McKendrick went to Tyrone's right side to help Officer Valente control his right arm, which was under Tyrone's body. Sargent McKendrick claims that Tyrone attempted to bite him, although never closed down.  At some point, according to Hansen,

the officers attempted to put a "spit mask" on Tyrone, but were unsuccessful.

The officers finally gained control of both arms and handcuffed Tyrone. Because the original handcuffs applied by Officer Valente had been bent during the struggle, Sargent McKendrick applied a second set of handcuffs to Tyrone's right hand, attached a third set to his left hand, then joined the two and removed the bent set. While Sargent McKendrick applied the handcuffs, he claims that Tyrone was still arching his back, attempting to push-up off the ground. During the majority of the struggle, the officers state that Tyrone was attempting to push-up off the ground by arching his back, as well as flailing his legs and rolling around, continuously resisting the officers' attempt to control him. None of the officers state that they ever heard Tyrone specifically say, "I can't breathe." They corroborate each other that only Officer Valente had at one point lain across Tyrone's back in an attempt to secure the handcuffs.

Once Tyrone was under control and handcuffed, still face down, Sargent McKendrick asked Tyrone if he was okay, called his name, and tapped him on the back but received no answer. The five officers flipped him onto his back at the instruction of Sargent McKendrick. At this point, Officer Bucs observed that Tyrone's eyes looked "glassy." They all realized that he was unconscious. Officer Robert Parton then asked the other officers

8

to retrieve a respirator from one of their vehicles. Officer
Robert Parton put the oxygen mask on Tyrone, while some of the
other officers attempted to perform first-aid on Tyrone. Soon
after, Tyrone was loaded onto a backboard and transferred by
ambulance to the hospital. During transport to the hospital, an
external defibrillator was used on Tyrone. Tyrone, however, was
pronounced dead when he reached the hospital. Tyrone's death
certificate lists his cause of death as "Acute Congestive Heart
Failure Secondary to Cardiomegaly with Foci of Fibrosis
Concomitant with struggle with police," which plaintiffs call
"positional asphyxia." The entire struggle from when Officer
Valente applied the first handcuff to when Tyrone became "under
control" lasted less than ten minutes.

    As a result of these events, the New Jersey Division of
Criminal Justice and the U.S. Department of Justice, Civil Rights
Division, conducted investigations. The Division of Criminal
Justice determined that the officers acted reasonably and in good
faith in their attempt to enforce an involuntary commitment
order. The U.S. Department of Justice determined that the
evidence did not establish a prosecutable violation of the
federal criminal civil rights statute. Subsequently, Tyrone's
mother filed the instant case against defendants. Following the
voluntary dismissal of plaintiffs' claims against several

defendants,[5] the claims that remain against the Township of
Willingboro, Officers James Parton, Robert Parton, Matthew
Valente, Ian Bucs, James McKendrick and Director Benjamin
Braxton[6] include Constitutional violations brought under 42
U.S.C. § 1983, discrimination claims under the Americans with
Disabilities Act ("ADA") 42 U.S.C. § 12132, State Constitutional
and Civil Rights violations, violations of the New Jersey Law
Against Discrimination ("NJLAD"), and violations under the New
Jersey Tort Claims Act.  Defendants have moved for summary
judgment on all of plaintiffs' claims.  Plaintiffs have opposed
defendants' motion.

**DISCUSSION**

### A. Jurisdiction

Plaintiffs have brought their claims pursuant to 42 U.S.C. §
1983, as well as the New Jersey constitution and New Jersey state
law.  This Court has jurisdiction over plaintiffs' federal claims
under 28 U.S.C. § 1331, and supplemental jurisdiction over
plaintiffs' state law claims under 28 U.S.C. § 1367.

---

[5] All claims against defendants Willingboro Police
Department, Lester A. Drenk, Behavioral Health Center, Tara
Wolozyn Hansen, Officers Brian Cantwell, Donna Dimitri, Richard
Coupe, Timothy Reynolds, Robert Burgess, and Curtis Hankey have
been dismissed with prejudice.

[6] Benjamin Braxton served as the Director of Public Safety
for the Township of Willingboro from 1994 to 2007.

10

**B. Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits

11

or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## C. Analysis

### 1.   Plaintiffs' Constitutional claims against the individual police officers

Plaintiffs argue that Officers Valente, James Parton, Robert Parton, Bucs and Sargent McKendrick used excessive force to restrain Tyrone during the struggle in his front yard, causing him to die of positional asphyxia.  Defendant officers argue that they are entitled to summary judgment based on qualified immunity because the force used to restrain Tyrone was, as a matter of law, objectively reasonable and not excessive.

The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable.[7]  The doctrine of qualified

---

[7]Because the analysis of claims under state constitutional law is similar to the analysis under the Fourth Amendment, no separate analysis will be undertaken for plaintiff's claims arising under the New Jersey Constitution.  See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (granting defendants' motion for summary judgment on plaintiffs' claims under Article I, paragraph

immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). The doctrine provides a government official immunity from suit rather than a mere defense from liability, and, thus, the issue of whether qualified immunity applies should be decided at the earliest possible stage in litigation. Id.

In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct?

---

7 of the New Jersey Constitution, because it was already established that there was no federal constitutional violation) (citing Desilets v. Clearview Regional Bd. of Educ., 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its *T.L.O.* opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.")).

Id. at 816.  These questions may be answered in order, but courts
are "permitted to exercise their sound discretion in deciding
which of the two prongs of the qualified immunity analysis should
be addressed first in light of the circumstances in the
particular case at hand."  Id. at 818 (receding from Saucier v.
Katz, 533 U.S. 194 (1998), which required the two questions to be
answered sequentially).  If the answer to the question addressed
first is "no," the analysis may end there.  See id. at 823
(finding that because the unlawfulness of the officers' conduct
was not clearly established, the officers were entitled to
qualified immunity, without having to answer the question of
whether the officers violated the plaintiff's constitutional
rights).

     Plaintiffs contend that the officers used excessive force in
their efforts to transport Tyrone to the SCIP, in violation of
his Fourth Amendment rights.  Plaintiffs also contend that it is
clearly established that the officers knew that using such force
in these circumstances was unlawful.

     In determining whether excessive force was used, the Fourth
Amendment's "objective reasonableness" test is applied.  Sharrar
v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v.
Connor, 490 U.S. 386, 396 (1989)).  The objective reasonableness
test "requires careful attention to the facts and circumstances
of each particular case, including the severity of the crime at

issue, whether the suspect poses an immediate threat to the
safety of the officers or others, and whether he is actively
resisting arrest or attempting to evade arrest by flight."  Id.
(relying on Graham, 490 U.S. at 396; Groman v. Township of
Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  "Other relevant
factors include the possibility that the persons subject to the
police action are themselves violent or dangerous, the duration
of the action, whether the action takes place in the context of
effecting an arrest, the possibility that the suspect may be
armed, and the number of persons with whom the police officers
must contend at one time."  Id.

In evaluating the proper test for objective reasonableness,
the Supreme Court has provided that "not every push or shove,
even if it may later seem unnecessary in the peace of a judge's
chambers, . . . violates the Fourth Amendment."  Graham, 490 U.S.
at 396 (citation omitted).  Rather, "[t]he calculus of
reasonableness must embody allowance for the fact that police
officers are often forced to make split-second judgments--in
circumstances that are tense, uncertain, and rapidly evolving--
about the amount of force that is necessary in a particular
situation."  Id.

As a primary matter in this case, despite plaintiffs'
argument to the contrary, the decision to transport Tyrone to the
SCIP cannot support a Fourth Amendment violation claim because

15

the defendant officers were obligated to transport Tyrone to the
hospital once Hansen authorized and ordered Tyrone's involuntary
commitment.   New Jersey statute provides:

> A State or local law enforcement officer *shall* take
> custody of a person and take the person immediately and
> directly to a screening service if: . . . A mental
> health screener has certified on a form prescribed by
> the division that based on a screening outreach visit
> the person is in need of involuntary commitment and has
> requested the person be taken to the screening service
> for a complete assessment.

N.J.S.A. 30:4-27.6 (emphasis added).

During Hansen's interaction with Tyrone on November 6, 2005,
she determined that he should be involuntarily transferred to the
SCIP, and completed the appropriate form on the scene.   The
"Authorization for Police Transport" form certified that Hansen
had "reasonable cause to believe that [Tyrone] may be mentally
ill and dangerous to self, other, or property."  (Def. Ex. 16.)
The form also directed that the Willingboro Police officers were
to transport Tyrone to the SCIP.   Although plaintiffs argue that
it was unreasonable for Hansen to initiate the involuntary
commitment, the propriety of Hansen's decision is not an issue
before the Court.   Moreover, although plaintiffs argue that it
was unreasonable for the officers to attempt to facilitate
Tyrone's transfer, arguing that the officers should have just
left Tyrone at home, plaintiffs have not pointed to any authority
that would relieve the officers' mandatory duty under N.J.S.A.

16

30:4-27.6 to effect the transfer, or otherwise show that the
officers were aware that they had discretion to refuse the
transport based on their own assessment of Tyrone's mental
state.[8]  Thus, the fact that the officers attempted to secure
Tyrone's transfer to the SCIP is not a constitutional violation.

The relevant inquiry into assessing plaintiffs' Fourth
Amendment excessive force claim, therefore, is whether the
officers were objectively reasonable in how they effected
Tyrone's transfer.  It is generally undisputed that the two
events precipitating the struggle between Tyrone and the officers
were Tyrone's observation of a third police officer outside the
home, and Officer Valente's attempt to handcuff Tyrone when he
tried to go back inside his house.  Prior to those events,
although Tyrone was suffering from a "paranoid preoccupation"
when Officer Valente and Hansen arrived for the evaluation (see

---

[8]New Jersey statute provides that as long as officials act
in good faith and in a reasonable manner in certifying or
transporting an involuntary commitment patient, those officials
have immunity from being sued for their actions.  N.J.S.A. 30:4-
27.7.  Although the inquiry into the reasonableness of an
official's actions under this provision analyzes the same facts
as those proffered to support a Fourth Amendment violation, a
reasonableness analysis under the New Jersey statute cannot
support or defeat an excessive force claim under the Fourth
Amendment.  Bates v. Paul Kimball Hosp., 346 Fed. Appx. 883, 885
(3d Cir. 2009) (citing Bolden v. SEPTA, 953 F.2d 807, 818 (3d
Cir. 1991) (en banc) (citing Howlett v. Rose, 496 U.S. 356
(1990)) ("A state statute that creates immunity from suit under
state law does not define the scope of immunity from suit under
federal law.").  Because, however, there is no claim for a
violation of the New Jersey statute, the Court will not consider
the statute's immunity provision in any event.

Pl. Ex. 19), so much so that Hansen determined that Tyrone
required involuntary commitment, Tyrone was relatively
cooperative and non-violent, and none of the officers, family
members, or Hansen were concerned for their safety or well-being
due to Tyrone's behavior.  The ultimate trigger for Tyrone's
decompensation and resistence to his transport to the SCIP, and
the resulting struggle, was Officer Valente's attempted
handcuffing, which had been a reaction to Tyrone's sudden retreat
into the home caused by the unanticipated presence of a third
police officer outside.

    Based on this scenario, the Court must consider whether
Officer Valente's efforts to handcuff Tyrone, and the resulting
attempts by the other officers to secure Tyrone, were objectively
reasonable.  With regard to the handcuffing, plaintiffs argue
that but for Officer Valente's inappropriate attempt to handcuff
Tyrone, he never would have been armed with a weapon--the
dangling handcuffs--and, therefore, his take down and the
resulting struggle and death would have never occurred.
Plaintiffs further argue that Tyrone was never a threat until
Officer Valente decided to handcuff him, and that to absolve the
officers' use of deadly force based upon the very instrument
applied by Officer Valente is a perverse and unjust result, and a
constitutional violation.

    As a theoretical proposition, the Court agrees with

plaintiffs on their second point.  Any intent by a police officer
to essentially plant a weapon onto an individual in order to
justify the officer's use of deadly force is clearly
unconstitutional.  That situation, however, is not the one in
this case, as there is no evidence that Officer Valente had any
other motive for handcuffing Tyrone than to secure his
involuntary commitment transfer to the SCIP.

     With regard to plaintiffs' first issue with the handcuffing,
although plaintiffs contend that it was inappropriate for Officer
Valente to try to handcuff plaintiff, arguing that Tyrone was not
exhibiting violent behavior which necessitated such restraints,
other than a hindsight view of the result of the failed
handcuffing, plaintiffs do not provide any evidence that Officer
Valente was unreasonable in taking minimum measures to facilitate
Tyrone's involuntary commitment.  Due to Hansen's signing of the
involuntary commitment form, Officer Valente was required to
transport Tyrone to the SCIP.  Although cooperative at first,
Tyrone started to become even more agitated and tried to retreat
back into his home.  In the seconds when Tyrone slowed down,
turned around, and began to go back into the house, Officer
Valente made the split-second decision that the best way to
effect Tyrone's transfer, and remain in control of the mentally
decompensating and resisting individual, was to secure Tyrone's
arms with cuffs.  Handcuffing, by itself, is not a show of

excessive force.  Flood v. Schaefer, 367 Fed. Appx. 315, 319 (3d
Cir. 2010) (citing Kopec v. Tate, 361 F.3d 772, 778 (3d Cir.
2004)).  Moreover, the training that Officer Valente received on
how to properly interact with mentally ill individuals, and the
basic police officer training manual, do not forbid the use of
handcuffs, instead instructing that physical restraint should be
used sparingly.[9]  (See Pl. Ex. 18.)  Even though plaintiffs argue
that Tyrone never would have been deemed a danger if Officer
Valente simply allowed Tyrone to reenter the house, it is just as
reasonable for Officer Valente to believe that Tyrone's mental
state, combined with his size, could have resulted in a
precarious and possible dangerous situation if Tyrone were
permitted to retreat.[10]

---

[9]Plaintiffs argue that Office Valente did not appreciate
that Tyrone's size would have required two sets of handcuffs, and
that his attempt to handcuff Tyrone with one set was doomed from
the decision to apply them.  Officer Valente contends that the
use of two pairs of handcuffs is for an individual's comfort, and
that one pair can be readily applied to a person of Tyrone's
size.  Even if Officer Valente were required to use two pairs of
handcuffs, that requirement is immaterial in this case, as
Tyrone's resistence precluded Officer Valente from continuing the
handcuffing process past the application of the first cuff.

[10]Plaintiffs dispute Officer Valente's testimony that during
Hansen's evaluation of Tyrone, he recalled a prior incident
involving Tyrone, including one where Tyrone caused a disturbance
at a treatment facility called the Delaware House.  Defendants
argue that Officer Valente's recollection of that incident also
informed his decision to handcuff Tyrone, as Officer Valente had
an impression that Tyrone could turn violent.  Plaintiffs dispute
the veracity of Officer Valente's on-the-scene recollection.
When deciding a summary judgment motion, this Court cannot make
credibility determinations, and therefore cannot credit either

What would have happened if Officer Valente had never handcuffed Tyrone is unknown and unknowable.  As demonstrated by what happened next, it is evident that Officer Valente's decision to handcuff Tyrone set off a chain of events that ultimately turned tragic.  However, considering the entire situation-- Hansen's certification that Tyrone was "mentally ill and dangerous to self, other, or property," the requirement for the officers to transport this mentally ill individual to a treatment facility, the progressive exacerbation of Tyrone's paranoia, Tyrone's increasing agitation and resistence to go to the SCIP, and Tyrone's sudden attempt to push past Officer Valente to retreat into the home--Officer Valente's attempt to handcuff Tyrone was objectively reasonable under the circumstances.[11]

Just because an officer's conduct is reasonable at the beginning of an encounter does not, however, automatically provide a cloak of reasonableness to the subsequent actions of police officers for the remainder of that encounter.  Therefore,

---

side of the argument on this point.  Regardless, however, of Officer Valente's prior knowledge of Tyrone's behavior, the situation faced by Officer Valente on November 6, 2005 by itself presented a reasonable basis for Officer Valente to attempt to handcuff Tyrone.

[11]Although reasonableness is often a question for the jury, summary judgment in favor of defendants is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999).

even though Officer Valente's decision to handcuff Tyrone was
objectively reasonable, it must next be determined whether
Officer Valente and the other officers acted reasonably in their
actions to subdue and control Tyrone.

As plaintiffs point out, this situation differs from many
other excessive force cases because Tyrone was not a suspect of,
nor being arrested for, any crime.  Although the officers had
authority to "seize" plaintiff in order to transport him to the
SCIP, they were not dealing with a criminal situation, under
which the excessive force analysis typically arises.
Nonetheless, the reasonableness of the officers' actions still
must be considered under the circumstances of this particular
case, and analyzed pursuant to the guidance of Graham v. Connor,
490 U.S. 386, 396 (1989), and its substantial progeny.

It must be reiterated that the "reasonableness" inquiry in
an excessive force case is an objective one, with the question
being whether the officers' actions are "objectively reasonable"
in light of the facts and circumstances confronting them, without
regard to their underlying intent or motivation.  Graham, 490
U.S. at 386.  In this case, after Officer Valente failed to cuff
both of Tyrone's hands, what the officers faced was a large man
with a dangling set of handcuffs, who was resisting being
involuntarily committed, and who, in the words of plaintiffs'
expert, exhibited "paranoia to a point where he lost all self-

22

control [and] lost all ability to test reality." (Pl. Ex. 19.)
At that point, it was reasonable for the officers to try to
secure and subdue Tyrone.

How the officers came to control Tyrone is in dispute. The
officers relate that three of them brought him to the ground,
face down, and once the two additional officers arrived, they
each took a limb, with Officer Valente stretching over Tyrone's
back in order to remove his right arm from under him. The
officers all state that Tyrone continued to resist and pull-up,
but once he was subdued, they discontinued their physical contact
with him. None of the officer relate that they heard Tyrone
yelling that he could not breathe.

In contrast, Tyrone's mother, sister, cousin, neighbor, and
the SCIP caseworker Hansen all state that they heard Tyrone yell,
at least once, that he could not breathe. Tyrone's family and
neighbor also recognize that Tyrone was resisting and pulling up,
but they consider Tyrone's behavior to be his attempt to breathe,
rather than to resist the officers' attempts to handcuff him.
Also in contrast to the officers' account, Tyrone's sister and
cousin contend that eight to ten officers all piled on top of
Tyrone, rather than only Officer Valente, with the other officers
controlling Tyrone's limbs.

Taking these two versions of events and viewing them in the
light most favorable to plaintiffs, this Court must determine

23

whether the officers acted objectively reasonably in the
following scenario: In order to control a 300 pound, 6'2",
involuntarily committed, out-of-control, up-to-that-point
previously non-violent, paranoid schizophrenic man, who had one
dangling handcuff on his right hand under his face-down body,
five[12] police officers piled on top of him.  That man then
continuously and vigorously pulled-up and resisted being fully
handcuffed, while repeatedly yelling "I can't breathe," until he
became compliant, which was due to his lack of consciousness.
Although this scenario presents a difficult case with a tragic
outcome, the Court finds that these officers acted objectively
reasonably in this situation.

    To determine objective reasonableness, the key distinction
in cases involving similar situations where an individual has
died from positional asphyxia is whether the officers' chest
compression or other breath-restricting positioning was employed
while that individual is actively resisting being restrained or
while he has already become restrained.  See, e.g., Bornstad v.
Honey Brook Twp., 211 Fed. Appx. 118, 124 (3d Cir. 2007)
("Although officers--indeed, any reasonable person--should [know]
that squeezing the breath from a compliant, prone, and handcuffed

_____

[12]Despite two of plaintiffs' witnesses stating that they saw
eight to ten officers on the scene, plaintiffs have not provided
any evidence that more than the five named defendant officers
were part of the physical struggle with Tyrone.

individual despite his pleas for air involves a degree of force
that is greater than reasonable, it is not so clearly
unreasonable to exert severe force on an individual who continues
to violently resist arrest." (citations and quotations omitted)).
This distinction is applied in cases involving the arrest of a
criminal suspect, such as <u>Bornstad</u>, but it is also applied in
cases involving the unarmed, non-criminal handling of a mentally
ill individual.

For example, in <u>Drummond v. City of Anaheim</u>, 343 F.3d 1052,
1054 (9th Cir. 2003), which is quoted in <u>Bornstad</u>, Brian Drummond
had a history of mental illness (bipolar disorder and
schizophrenia).  One night, Drummond's neighbor called the police
because he was afraid that Drummond was going to hurt himself by
darting into traffic.  Three police officers responded to the
call, and they found Drummond in a 7-Eleven parking lot.
Drummond, who was unarmed, was hallucinating and in an agitated
state, and the officers called for an ambulance to transport him
to a medical facility.  Before the ambulance arrived, however,
the three officers decided to take him into custody, "for his own
safety."  Independent eyewitnesses saw one officer "knock
Drummond to the ground [,] where the officers cuffed his arms
behind his back as Mr. Drummond lay on his stomach."  Although
Drummond offered no resistance, another officer "put his knees
into Mr. Drummond's back and placed the weight of his body on

him. [The first officer] also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck." Drummond, 343 F.3d at 1054. Drummond, who was 160 pounds, soon fell into respiratory distress, with two eyewitnesses observing that Drummond repeatedly told the officers that he could not breathe and that they were choking him. Id. at 1055. Despite Drummond being restrained and complaining about his breathing problems, the officers continued to put their weight upon Drummond's back and neck. Id.

After twenty minutes, another officer arrived, who applied a "hobble restraint" to bind Drummond's ankles. One minute after the restraint was applied, Drummond went limp, and the officers realized that he had lost consciousness. They checked his pulse, and then removed the handcuffs and hobble restraint and turned him over, onto his back. The officers attempted to perform CPR on Drummond until the paramedics finally arrived. Although Drummond was revived approximately seven minutes after losing consciousness, he sustained brain damage and fell into a "permanent vegetative state." Id.

As a result of this incident, Drummond's brother brought an excessive force claim against the police officers. The district court granted summary judgment in favor of the police officers, finding that they were entitled to qualified immunity because they had acted objectively reasonably. The Ninth Circuit

reversed.  Following <u>Graham</u>, the court first noted that no
underlying crime was at issue because the police had become
involved solely because a neighbor was worried that Drummond was
acting in an emotionally disturbed manner and might injure
himself.  <u>Id.</u> at 1057.  The court then found that although
"Drummond may have represented a threat (to himself or possibly
others) before he was handcuffed--an action that he does not
claim was in itself an excessive use of force--after he was
'knock[ed] . . . to the ground where the officers cuffed his arms
behind his back as [he] lay on his stomach,' a jury could
reasonably find that he posed only a minimal threat to anyone's
safety."  <u>Id.</u>  Finally, the court found once Drummond was on the
ground and was not resisting the officers, "there was therefore
little or no need to use any further physical force."  <u>Id.</u> at
1058.  The court concluded, "All three <u>Graham</u> factors would have
permitted the use of only minimal force once Drummond was
handcuffed and lying on the ground."  <u>Id.</u>

      Pertinent to the case here, the Ninth Circuit[13] further

_____

      [13]The Ninth Circuit also listed several cases throughout the
country that have considered situations where individuals have
suffocated under the weight of restraining officers.  <u>See, e.g.</u>,
<u>Jones v. Ralls</u>, 187 F.3d 848, 850, 852 n.4 (8th Cir. 1999);
<u>Bozeman v. Orum</u>, 199 F. Supp. 2d 1216, 1226 (M.D. Ala. 2002);
<u>Tofano v. Reidel</u>, 61 F. Supp. 2d 289, 292-95 (D.N.J. 1999) (MTB)
(holding that police officers' force used in attempting to
restrain an emotionally disturbed individual who was violently
resisting handcuffing was objectively reasonable under the
circumstances); <u>Alexander v. Beale St. Blues Co.</u>, 108 F. Supp. 2d
934, 939 (W.D. Tenn. 1999); <u>Johnson v. City of Cincinnati</u>, 39 F.

explained its reasoning for finding that the officers acted
unreasonably:

> [S]ome force was surely justified in restraining
> Drummond so that he could not injure either himself or
> the arresting officers.  However, after he was
> handcuffed and lying on the ground, the force that the
> officers then applied was clearly constitutionally
> excessive when compared to the minimal amount that was
> warranted.  Drummond was a mentally disturbed
> individual not wanted for any crime, who was being
> taken into custody to prevent injury to himself.
> Directly causing him grievous injury does not serve
> that objective in any respect.  Once on the ground,
> prone and handcuffed, Drummond did not resist the
> arresting officers.  Nevertheless, two officers, at
> least one of whom was substantially larger than he was,
> pressed their weight against his torso and neck,
> crushing him against the ground.  They did not remove
> this pressure despite Drummond's pleas for air, which
> should have alerted the officers to his serious
> respiratory distress.  Moreover, according to
> independent eyewitnesses, other officers "stood around
> and laughed" while Drummond was restrained; although
> the officers' "underlying intent or motivation" is
> irrelevant to the excessive force inquiry, Graham, 490
> U.S. at 397, the officers' apparent lack of concern
> does indicate that Drummond was not sufficiently
> dangerous to others to warrant the use of the severe
> force applied.

Id. at 1059.

Here, when considering cases like Bornstad and Drummond, if
Tyrone had been successfully handcuffed and the officers still
remained on his back while he pushed-up and yelled that he could
not breathe, it would be clear that the officers acted
unreasonably.  Unfortunately, however, it was Tyrone's continued

---

Supp. 2d 1013, 1018 (S.D. Ohio 1999).

resistence to being handcuffed that left the officers to make a
heat-of-the-moment decision to either (1) allow a large man with
a potential weapon (the dangling handcuffs) in a mentally
decompensated, out-of-control state run free among the officers,
case worker, bystanders and family members, or (2) try to
physically control him by completing the handcuffing.  The
officers made the latter choice, and that choice cannot be
considered objectively unreasonable under the circumstances, for
several reasons.

First, several of the Graham factors are satisfied.  Tyrone
had been deemed by Hansen to be "dangerous to self [or]
other[s]," he was subsequently deemed to be dangerous due to the
dangling handcuffs, which could be used as a weapon, and he was
actively resisting being involuntarily committed and trying to
flee.  Additionally, the entire encounter from the attempted
handcuffing to Tyrone's compliance was less than ten minutes.
These factors weigh in favor of the officers' decision to use
some force to control Tyrone.

Second, even if the officers heard Tyrone's repeated yells
that he could not breathe, once they finally secured the
handcuffs, they undisputedly alighted from touching any part of
his body.  Ostensibly it was Tyrone's unconsciousness from the
lack of air that caused him to cease resisting, rather than his
volitional decision to become compliant, but the officers were

29

not aware of Tyrone's condition at that point.  Instead, once they secured Tyrone's hands, they discontinued any use of force. This is consistent with <u>Bornstad</u> and <u>Drummond</u>.

Third, it is undisputed that the officers were unaware of, and they did not receive any training on, positional asphyxia. Although the Third Circuit, quoting <u>Drummond</u>, recognized that a police officer would not need training to know that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable," a police officer unaware of the positional asphyxia phenomenon, combined with the need to restrain a violently resisting individual, is a different consideration.[14]   <u>Bornstad</u>, 211 Fed. Appx. at 124.  Furthermore,

---

[14]Plaintiffs implore that the Willingboro Police Department is violating the constitution by failing to train its officers on the dangers of positional asphyxia.  The Court will not reach plaintiffs' failure to train claims because, as discussed below, without any constitutional violation by its officers, the Township cannot be held liable for any alleged training failures. The Court notes, however, that several police departments in the cases cited above provide training to their officers on positional asphyxia, and the Ninth Circuit in <u>Drummond</u> commented in 2003,

> The compression asphyxia that resulted appears with unfortunate frequency in the reported decisions of the federal courts, and presumably occurs with even greater frequency on the street. Indeed, the Anaheim Police Department was sufficiently concerned about compression asphyxia that in a training bulletin, it specifically warned its officers of the danger of kneeling on a detainee's neck or back almost one year before the incident that sent Drummond into a coma.

although the intent of the officers is irrelevant to the excessive force analysis, the unknown consequences of certain positioning while attempting to control a resisting individual is much different from the volitional force commonly associated with excessive force cases, such as kicking, punching, and shooting.[15]

Consequently, based on all these considerations in light of the situation as presented by plaintiffs, the officers acted objectively reasonably, despite the tragic outcome. The officers are therefore entitled to qualified immunity, and, accordingly, summary judgment must be entered in their favor on plaintiffs' Fourth Amendment claim.

---

Drummond v. City of Anaheim, 343 F.3d 1052, 1063 (9th Cir. 2003). Whether the positional asphyxia phenomenon should be part of the Willingboro police officers' training is not for this Court to decide.

[15]Although the consequences of the officers' force was deadly, death by positional asphyxia has not been held to constitute "deadly force," as defined by the Supreme Court. See, e.g., Drummond v. City of Anaheim, 343 F.3d 1052, 1057 n.4 (9th Cir. 2003) (explaining that "[d]espite the deadly history of this type of force, it is not clear whether the force allegedly applied in this case constitutes 'deadly force' under Tennessee v. Garner, 471 U.S. 1 (1985)"); Guseman v. Martinez, 1 F. Supp. 2d 1240, 1258-59 (D. Kan. 1998) (explaining, "Almost any type of force can cause death in aberrant circumstances. The limits on the use of 'deadly force' under the Fourth Amendment, however, apply only to 'that force which is reasonably likely to cause death.' That cannot be said of the prone method of restraint even though it has the potential to cause death in certain circumstances. There is no evidence that the probability of death is so high as to be considered 'likely' when such restraint is used." (citation omitted)).

## 2.    Failure to Train

Plaintiffs allege that defendants Director Braxton and the
Township of Willingboro are liable for the actions of the
defendant officers for failing to properly train them and for
exhibiting a "deliberate indifference" to the officers' execution
of their duties, in violation of the Fourth Amendment.

Liability under § 1983 may be imposed on municipalities or
supervisors where acts of a government employee are deemed to be
the result of a policy or custom of the municipality for whom the
employee works.   See Monell v. New York City Dep't of Soc.
Servs., 436 U.S. 658, 691 (1978); Natale v. Camden County
Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).   In
cases where the plaintiff alleges that the municipality failed to
properly train the employee, the municipality can be liable under
§ 1983 if the failure to train constitutes "deliberate
indifference" to the rights of persons with whom the police come
into contact; mere negligence to adequately train is not enough.
Malignaggi v. County of Gloucester, 855 F. Supp 74, 77 (D.N.J.
1994).   "In general, where a plaintiff seeks to establish
liability based on a supervisor's (or municipality's) failure to
train or supervise adequately, the plaintiff must show that a
need for more or different training or supervision is so obvious,
and the inadequacy so likely to result in constitutional
violations, that the failure to train or supervise can fairly be

said to represent official policy." Calhoun v. Vicari, No.
05-4167, 2005 U.S. Dist. LEXIS 22461, 2005 WL 2372870, at *3
(D.N.J. Sept. 26, 2005) (relying on City of Canton v. Harris, 489
U.S. 378, 388-92 (1989)). In order to bring a claim of failure to
train, a plaintiff must: "(1) identify the deficiency; (2) prove
that the deficiency caused the alleged constitutional violation;
and (3) prove that the failure to remedy the deficiency reflected
deliberate indifference on the part of the municipality."
Malignaggi, 855 F. Supp. at 77 (citing Canton, 489 U.S. at 391;
Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991)).

        In order for there to be municipal liability, however,
"there still must be a violation of the plaintiff's
constitutional rights." Brown v. Comm., Dep't of Health
Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir.
2003); Bornstad, 211 Fed. App. at 126.  Accordingly, because the
Court has not found that the defendant officers violated Tyrone's
constitutional rights, there is no basis for municipal liability.
Thus, summary judgment must be entered in the favor of defendants
Director Braxton and the Township of Willingboro on plaintiffs'
failure to train claim.

### 3.   Plaintiffs' ADA Claim and NJLAD Claim

        Plaintiffs allege that defendants violated the rights of
Tyrone under the Americans with Disabilities Act, 42 U.S.C. §
12132, and the New Jersey Law Against Discrimination, N.J.S.A

                                  33

10:5-1. Plaintiffs contend that because Tyrone was unlawfully taken into custody, not perceived to be a danger to himself or others, and the defendant officers' offer no justification for restraining Tyrone, besides his mental illness, defendants are liable under the ADA and NJLAD.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1990). In order to state a prima facie discrimination case under the ADA, a plaintiff must demonstrate that: "(1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities or a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." Bowers v. National Collegiate Athletic Assn., 9 F. Supp. 2d 460, 475 (D.N.J. 1998). Additionally, N.J.S.A. 10:5-4 provides, in part, that "[a]ll persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability." N.J.S.A. 10:5-4.

Defendants do not deny that Tyrone was a qualified individual with a disability. Defendants argue, however, that

34

once Hansen involuntarily committed Tyrone after she determined
he was a danger to himself and others, they were under a
statutory duty to take custody of him and transport him to the
hospital. Defendants thus argue that their efforts to secure
Tyrone's transfer to the SCIP for treatment cannot constitute
discrimination.

As stated above, the propriety of Hansen's decision to
involuntary commit Tyrone to the treatment facility is not an
issue that the Court can decide--Hansen is no longer a party to
this case, and the defendant officers did not make that decision.
For whatever reason, proper or not, Hansen certified Tyrone's
involuntary commitment, and the officers were then obligated to
facilitate his transport. Obviously, the officers' interaction
with Tyrone was solely based on his disability. That conduct,
however, cannot serve as a basis for an ADA or NJLAD violation
for disability discrimination because such a finding would
convert every involuntary commitment transport into a civil
rights violation. Moreover, the undisputed motivation for taking
Tyrone into custody was so that Tyrone could receive publicly
funded treatment for his disability. In this case under these
circumstances, plaintiffs cannot demonstrate any discrimination
based on Tyrone's mental illness. Accordingly, judgment in favor
of defendants on these claims must be entered.

**4.    Plaintiffs' tort claims**

Plaintiffs have also alleged several tort claims for negligence, wrongful death and survival.  Defendants have moved for summary judgment on these claims, and plaintiffs have not opposed their motion.  These claims fail as a matter of law because, based on the findings above concerning the officers' and Township's liability for plaintiffs' alleged constitutional violations, defendants are immune from suit under the New Jersey Tort Claims Act, and plaintiffs have otherwise failed to support any negligence by defendants.  See N.J.S.A. 59:2-10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."); N.J.S.A. 59:3-3 ("A public employee is not liable if he acts in good faith in the execution or enforcement of any law."); N.J.S.A. 59:3-14(a); Mantz v. Chain, 239 F. Supp. 2d 486, 507-08 (D.N.J. 2002) (quoting PBA Local No. 38 v. Woodbridge Police Dep't, 832 F. Supp. 808, 830 (D.N.J. 1993) (internal quotations omitted)) (explaining that a public employee's immunity is stripped if that employee is found to have engaged in "willful misconduct," is the "commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence").

36

## CONCLUSION

This case shows that Tyrone Awkward's family wished to provide help to their mentally ill loved one, who was struggling with his illness.  Tyrone's family contacted the local crisis intervention program for assistance, and it is evident that all the parties involved hoped to peacefully facilitate his transfer to the treatment program to receive that help.  Unfortunately, over the course of the screening process, Tyrone's condition deteriorated, and it was determined that he needed to be involuntarily committed.  His condition further deteriorated as the police officers tried to coax Tyrone into the transport vehicle due to the presence of additional police officers and a failed handcuffing attempt, which then set off a chain of events that lead to his death.  Tyrone's death is tragic, and was an unimagined outcome of his family's call for help.  His death, however, was an accident, and not the result of the officers' unconstitutional use of force or discriminatory intent.  Based on that finding, neither the officers nor the Township can be legally liable for Tyrone's death, and, accordingly, their motion for summary judgment must be granted.

An appropriate Order will be entered.

Dated: September 30, 2010            s/ Noel L. Hillman

At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.

37